# United States Court of Appeals
## For the First Circuit

No. 05-1858

In re: ROBERT LOUIS MARRAMA,

Debtor.

ROBERT LOUIS MARRAMA,

Plaintiff, Appellant,

v.

CITIZENS BANK OF MASSACHUSETTS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

David G. Baker for the appellant.
Michael A. Wirtz, with whom Jack Mikels & Associates was on brief, for the appellee.

April 20, 2006

**LIPEZ, Circuit Judge**.  After Robert Marrama filed for Chapter 7 bankruptcy protection, Citizens Bank contended that Marrama should be denied a discharge because he recently had transferred assets to defraud his creditors.  See 11 U.S.C. § 727(a)(2)(A).  The bankruptcy court entered summary judgement for the bank.  Marrama appealed to the district court, which sustained the bankruptcy court's judgment.  On Marrama's further appeal, we too conclude that summary judgment was appropriate and affirm.

## I.

We review the facts in the light most favorable to Marrama, the non-movant in the summary judgment proceedings. Medeiros v. Vincent, 431 F.3d 25, 29 (1st Cir. 2005).[1]  Before his bankruptcy filing, Marrama owned RLM Flooring, a small Massachusetts company that sold and installed flooring products. RLM Flooring maintained a line of credit with Citizens Bank, which Marrama had guaranteed personally.  When Marrama's flooring business ran into problems, Citizens demanded repayment of the line of credit -- roughly $255,000 -- in June 2002.  Two weeks later, Citizens commenced a Massachusetts state court collection action. In August, the state court granted Citizens the authority to seize RLM Flooring and sell its assets.  At the same time, that court

---

[1] We also narrated facts relating to this case in our previous opinion affirming the bankruptcy court's finding that Marrama's "bad faith" warranted the court's refusal to allow him to convert his petition for Chapter 7 bankruptcy protection into a Chapter 13 case.  See In re Marrama, 430 F.3d 474 (1st Cir. 2005).

also ordered Marrama not to dispose of any personal assets except to pay for his normal living expenses. Citizens liquidated Marrama's flooring business, but sale of the company's assets failed to satisfy the bank's claim.

Meanwhile, Marrama made some unusual personal financial transactions. In July 2002, Marrama refinanced a vacation home he owned in York, Maine. In connection with the refinancing, Marrama received $118,000 in cash. He deposited these proceeds into a Maine bank account he held jointly with his girlfriend, Josephine Bolleterio. From the joint account, he withdrew approximately $8,000, which he told the trustee that he used, at least in part, to pay certain personal and business creditors. Then he transferred roughly $109,000 into an account standing in Bolleterio's name alone, leaving only a small sum in the joint account. In late August 2002 -- after the Massachusetts court ordered him not to transfer any assets -- Marrama used the York property to fund "the Bo-Mar Realty Trust," a spendthrift trust of which Bolleterio is the trustee. The York home is the trust's only asset, and Marrama is its only beneficiary. Marrama later testified that he placed the home into the trust to "try to protect it."

In March 2003, Marrama petitioned for Chapter 7 bankruptcy protection. On forms and schedules he filed with his bankruptcy petition, Marrama disclosed his beneficial interest in

the Bo-Mar trust but stated, under penalty of perjury, that he had not transferred any assets during the previous year. Marrama later termed his failure to disclose the transfer of the York home a scrivener's error. Marrama does not point to anything in the record suggesting an excuse for his failure to disclose his deposit of the refinancing proceeds into Bolleterio's solo account.

Citizens soon filed a bankruptcy court adversary action to deny Marrama a discharge. The bank contended that Marrama had forfeited his right to a discharge by transferring the York home to the trust; by transferring the refinancing proceeds to Bolleterio; and by transferring $40,000 to the lawyer who represented him in state court,[2] also less than a year before his petition for bankruptcy protection. Any of these allegedly fraudulent transfers could constitute an independent ground for denying Marrama a discharge, pursuant to § 727(a)(2)(A).[3]

Contentious proceedings followed. Citizens demanded discovery testimony from Marrama. Marrama answered certain inquiries from the bankruptcy trustee. But, in reaction to

---

[2] Marrama is represented by a different lawyer in this action.

[3] The bank leveled other accusations as well. Altogether, its complaint against Marrama included nine counts, including one that alleged Marrama's "commission of Bankruptcy Crimes for making false oaths and withholding records." The bankruptcy court relied on the fraudulent transfer issue in granting summary judgment to the bank. Because a fraudulent transfer is a sufficient ground for denying Marrama a discharge, we need not reach Marrama's objections about the other counts of Citizens's complaint.

Citizens's insistent complaints about his "bankruptcy crimes," Marrama cited the Fifth Amendment and refused to respond to Citizens's questions about the transfers to the trust, Bolleterio, and his lawyer.

The bankruptcy court granted the bank's motion for summary judgment. Ruling from the bench, the court concluded:

> [T]he bank has certainly made a prima facie case that . . . disclosures were not made that should have been made, that transfers were made that should have been reported. All these things are set out in the motion for summary judgment, and if standing alone with no opposition would certainly justify the granting of summary judgment and the denial of Marrama's discharge.
>
> One of the problems here is that the defendant debtor is in the unenviable position of wishing to claim the Fifth Amendment and defending against a motion for summary judgment. Now he claims that the bank is unable to give proof of evidence that he intended to defraud, but at the same time he claims that the bank is not prejudiced. But there's no way to find out his intent if he's claiming the Fifth because he won't tell us what his intent was. Indeed, I can and will draw a negative inference from the fact that he is standing mute when it comes to these matters which are civil and not criminal.
>
> When I come to the response to the motion for summary [judgment], which I permitted to be filed in open court today, and I look over it, I don't find anything that contradicts the assertions made in the bank's moving papers to the extent that they are necessary for me to grant summary judgment.

Marrama's appeal to the district court focused on the bankruptcy court's determination that it could draw a negative inference, in summary judgment proceedings, from Marrama's invocation of the Fifth Amendment in adversarial discovery proceedings. Marrama argued that such an inference was inconsistent with the maxim that, on summary judgment, inferences are drawn in favor of the non-movant. The district court was unconvinced by Marrama's argument but concluded that, even without any negative inference, the record warranted summary judgment for the bank.

**II.**

On further appeal, Marrama again claims that the bankruptcy court drew an impermissible inference from his invocation of his Fifth Amendment rights. Marrama admits that he transferred property less than one year before his bankruptcy petition. He contends only that, without an inference drawn against him, the summary judgment record does not permit a conclusion that Marrama intended to defraud his creditors when he made the transfers.

We have recognized that four elements are required to deny a discharge pursuant to § 727(a)(2)(A): (1) transfer or concealment of property (2) that belonged to the debtor (3) less than a year before the bankruptcy petition (4) with actual intent to hinder, delay, or defraud a creditor. See In re Schifano, 378

-6-

F.3d 60, 66-67 (1st Cir. 2004). Because a debtor rarely gives direct evidence of fraudulent intent, we have recognized that, even on summary judgment, intent to defraud a creditor can be proved by circumstantial evidence. See In re Varrasso, 37 F.3d 760, 764 (1st Cir. 1994). In weighing evidence of fraudulent intent courts should look to the following "objective indicia":

> (1) insider relationships between the parties; (2) the retention of possession, benefit or use of the property in question; (3) the lack or inadequacy of consideration for the transfer; (4) the financial condition of the [debtor] both before and after the transaction at issue; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of the debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; and (7) an attempt by the debtor to keep the transfer a secret.

In re Watman, 301 F.3d 3, 8 (1st Cir. 2002) (internal citations omitted).

Evidence of fraud is conclusive enough to support summary judgment in a § 727(a)(2)(A) action when it yields no plausible conclusion but that the debtor's intent was fraudulent. See In re Varrasso, 37 F.3d at 764 ("[I]n certain cases, circumstantial evidence may be sufficiently potent to establish fraudulent intent beyond hope of contradiction."). In the face of such evidence, the debtor hoping to resist summary judgment cannot rest on "'conclusory allegations, improbable inferences, and unsupported

-7-

speculation.'" Id. (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

We acknowledge our reservations about the bankruptcy court's decision to draw a negative inference against Marrama, at the summary judgment stage, on the basis of his invocation of a Fifth Amendment privilege. It is clear that the bankruptcy court can draw an inference at trial from a party's invocation of a Fifth Amendment privilege, see In re Carp, 340 F.3d 15, 23 (1st Cir. 2003). But we have expressed doubt as to whether a court can draw the same inference at the summary judgment stage, where all reasonable inferences must be drawn for the non-movant. See Mulero-Rodríquez v. Ponte, Inc., 98 F.3d 670, 678 (1st Cir. 1996) (explaining that a party's invocation of the Fifth Amendment in discovery does not alter requirement that inferences be drawn in favor of summary judgment non-movant); see also United States v. 4003-4005 5th Ave., 55 F.3d 78, 83 (2d Cir. 1995) (noting that invocation of the Fifth Amendment privilege does not alter evidentiary burdens (citing United States v. Rylander, 460 U.S. 752 (1983)); LaSalle Bank Lake View v. Seguban, 54 F.3d 387, 389-94 (7th Cir. 1995) (holding that non-movant's invocation of the Fifth Amendment privilege does not free the summary judgment movant from showing that the evidence in the record requires judgment as a matter of law).

We need not determine here whether the bankruptcy court's inference constituted error. Our standard of review in this case is de novo. In re Spookyworld, Inc., 346 F.3d 1, 6 (1st Cir. 2003). We are in the same position as the bankruptcy court and can affirm a grant of summary judgment "on any independently sufficient ground" in the record. Mesnick v. General Elec. Co, 950 F.2d 816, 822 (1st Cir. 1991). We draw no inference from Marrama's silence but still see no issue of material fact that precludes summary judgment. We also note one other difference between the bankruptcy court's analysis and our own. While the bankruptcy court appears to have looked generally at Marrama's course of conduct in granting summary judgment, we focus specifically on Marrama's transfer of his York vacation home to the Bo-Mar trust and his deposit of over $100,000 into an account under the sole control of his girlfriend.

The summary judgment record includes Marrama's direct admission that he had transferred his vacation home "to protect it," and several circumstantial badges of fraud. As for the transfer to the trust: Marrama acted in direct violation of a state court order that he not dispose of any assets except to pay for normal living expenses; Marrama transferred the property to a spendthrift trust, a device designed to shield assets from creditors;[4] Marrama attempted to retain his right to use his

---

[4] "A spendthrift trust is defined as one created to provide a fund for a beneficiary and at the same time secure it against his improvidence or incapacity. It is an active trust with provision

-9-

vacation home by making himself the sole beneficiary of his new spendthrift trust; and Marrama failed to include the transfer in the papers accompanying his bankruptcy petition. As for the deposit of the refinancing proceeds into Bolleterio's account: Marrama admits that he continued to have access to the money after the transfer; he did not disclose the transfer or any financial interest in Bolleterio's account (or the joint account in which the funds previously were held) in his bankruptcy papers; the transfer occurred during a period of financial distress and actual or impending litigation; and he had a close relationship with the person to whom he made the transfer.

Marrama notes that he recorded the transfer of the home to the trust with the local deeds office, that his lawyer testified that the omission of the transfer of the home to the trust from the bankruptcy schedules had been his scrivner's error, and that he disclosed his beneficial interest in the spendthrift trust, and its holdings, in the bankruptcy petition. As for the transfer of funds to Bolleterio, Marrama points to his equivocal statement that he put the refinancing proceeds in Bolleterio's account because having two accounts was unnecessary, and that the money rightfully belonged to Bolleterio as trustee of the Bo-Mar

---

against alienation of the fund or property by voluntary act of the beneficiary or through legal process by creditors." Sec. Pac. Bank v. Chang, 80 F.3d 1412, 1415 (9th Cir. 1996).

-10-

trust.[5]  Also, he argues that Citizens has not proved that the transferred property constituted "all or substantially all" of his assets, even though the bankruptcy court has recognized such evidence as probative of fraudulent intent.  See In re Lang, 246 B.R. 463, 469 n.9 (Bankr. D. Mass.), aff'd 256 B.R. 539 (B.A.P. 1st Cir. 2000).  Marrama argues that this evidence is sufficient to create a triable issue of fact on the question of his intent in making the transfer.

We disagree.  Marrama's argument that the transfer of the refinancing proceeds to Bolleterio was warranted because she was the trustee of the Bo-Mar trust overlooks the fact that Marrama

---

[5] This evidence comes from comments Marrama made to the bankruptcy trustee about the transfer.  The exchange between Marrama and the trustee was as follows:

The trustee:  Why did you give [the money] to Josephine?

Marrama:  Just um, no reason.  No reason to have two accounts, so Josephine you know, was -- I had no reason for it.

The trustee:  Well, did you give it to her --

Marrama:  Well, Josephine asked, you know -- even though she's not on paper with the home and everything she is part, was part of the trust.

The trustee:  Uh-huh.

Marrama:  Um, I had owed her some money that we had borrowed to -- you know, at different times she had given me money.  But ah, she had asked me about just have her hold the money. [sic] And I said sure.

-11-

deposited the refinancing proceeds on July 29, before the transfer of the home to the trust. The funds belonged to Marrama alone, and he has not presented any legitimate financial explanation for the action other than a desire to let Bolleterio control the money. Although Marrama argues that his payments to creditors with the funds from the refinancing demonstrate that he had no fraudulent intent, Marrama only claims to have used a small portion of the money to pay creditors, and he concealed the funds transferred to Bolleterio when listing his assets. In other words, he continued to have access to and control over the money, and any reasonable finder of fact would be compelled to conclude on the evidence presented that the transfer was motivated at least in part by a desire to keep the funds out of the hands of his creditors.

Moreover, an array of undisputed facts support nearly every indication of fraudulent intent that we have recognized. Marrama transferred assets to the control of a person with whom he had a confidential relationship; Marrama admits that he retained beneficial interest in the assets; Marrama points to no evidence that he received valuable consideration for his transfer of the refinancing proceeds to Bolleterio; Marrama made the transfers while in financial distress and facing seizure of his assets; the transfers constitute a pattern of hiding assets that should have been subject to the bankruptcy proceeding; at least one of the transfers took place in violation of a state court order; and

-12-

Marrama attempted to conceal at least his transfer of the refinancing proceeds to Bolleterio. See In re Watman, 301 F.3d at 8; see also In re Marrama, 430 F.3d at 482 ("The instant case comports in all material respects with the classic profile of playing fast and loose with the bankruptcy process."); In re Lang, 246 B.R. at 470 (noting "common fact pattern seen in § 727(a)(2)(A) cases" of a debtor who "transfers property to a family member or close friend but retains the control or enjoyment of the transferred assets"). To boot, Marrama admitted that he had transferred his vacation home to the trust in order to "protect it," an inescapable reference to protection from his creditors.

There is only one reasonable inference that can be drawn from this record: that Marrama transferred valuable assets belonging to him, less than a year before he petitioned for bankruptcy protection, with the actual intent to defraud his creditors. See In re Schifano, 378 F.3d at 66-67. The bankruptcy court correctly granted summary judgment, and the district court correctly upheld that disposition.

**Affirmed.**